**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JUNE 11, 2026

*Styne, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 11, 2026

*Sarah Pendleton*

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Disciplinary Proceeding Against<br><br>SHAKESPEAR N. FEYISSA,<br><br>Lawyer (Bar No. 33747). | No. 202272-3<br><br>EN BANC<br><br>Filed: <u>June 11, 2026</u> |

GORDON McCLOUD, J.—After a 12-day disciplinary hearing, a hearing officer (HO) concluded that Shakespear N. Feyissa committed six counts of misconduct. The presumptive sanction for most of those counts was disbarment. The HO, however, stated that count 6, submission of false evidence to the Office of Disciplinary Counsel (ODC) during the grievance investigation, was the one that drove her decision to recommend disbarment; she "would have been willing to recommend a suspension of 18 months followed by a 2-year probationary period with a practice monitor" on the other counts. Clerk's Papers (CP) at 974 (sanction analysis (SA) 299). As she explained, Feyissa's "multiple and deeply troubling instances of misconduct after the Grievance was filed, particularly the creation and submission of the false declarations of [three clients], the numerous acts of deceptive

testimony about his client files, and his bad faith obstruction of discovery during the disciplinary process—acts which are deeply disrespectful of the legal system—. . . override any mitigating factors" and led her to recommend disbarment. *Id.* (SA 300).

The Disciplinary Board (Board) of the Washington State Bar Association (Bar) unanimously adopted the HO's disbarment recommendation. Feyissa appeals. First, he argues that ODC and the HO displayed racial bias, requiring a new hearing. Second, he challenges the HO's conclusions of law and sanction analysis for counts 2, 3, 4, 6, and 8.

The record does not support Feyissa's arguments about bias. Substantial evidence in the record does support the HO's conclusions of law and analysis of sanctions and aggravating and mitigating factors. We therefore accept the Board's unanimous recommendation and order Feyissa disbarred.

## FACTS AND PROCEDURAL HISTORY

I. Facts relating to first grievance: *Mahler*[1] surcharge provision, ambiguous final accountings, false statements to third parties

Attorney Shakespear N. Feyissa was born in Ethiopia. *Id.* at 889 (findings of fact (FOF) 3). He immigrated to the United States at around age 17. *Id.* (FOF 4). During law school, he briefly worked for the Department of Labor and Industries

---

[1] *Mahler v. Szucs*, 135 Wn.2d 398, 957 P.2d 632 (1998).

and for a small estate and probate firm. *Id.* at 890 (FOF 6). He graduated from law school in 2002 and became licensed in 2003. *Id.* (FOF 7). He worked briefly for a law firm doing document review before opening his own law office as a solo practitioner. *Id.* (FOF 8). Around 2009, Feyissa began to work on auto accident cases where plaintiffs had personal injury protection (PIP) coverage in their car insurance policies. *Id.* at 890-91 (FOF 9).

When he began working on PIP cases, Feyissa was not aware of this court's decision in *Mahler*. 135 Wn.2d 398. *Mahler* held that an insurer who obtains reimbursement for its PIP payments out of its insured's personal injury recovery must contribute a proportionate share of the insured's attorney fees and costs involved in obtaining the recovery. *Mahler* makes clear that the insurer's proportionate share belongs to the client because it is a component of the settlement funds. *Id.* at 428. *Mahler* does not hold that the insured's attorney is entitled to the insurer's proportionate share of the legal fees. *Id.*

According to Feyissa, another attorney told him sometime around 2013 that *Mahler* permitted him to collect an additional attorney fee. CP at 892 (FOF 13 (citing 8 Verbatim Rep. of Proc. (VRP) at 2018-19)). When Feyissa read *Mahler*, he subjectively, but erroneously, believed that *Mahler* held that "'the proportionate share goes to the lawyer.'" *Id.* (FOF 13 (quoting 8 VRP at 2016)), 903 (FOF 59).

In 2013, Feyissa began inserting a new provision into some, but not all, of his personal injury contingent fee agreements. *Id.* at 892-93 (FOF 14). This "*Mahler* provision,*"* emphasized below, read:

> The legal fee of Attorney shall be 33.3% of the gross amount recovered, if settlement is achieved without the necessity of filing a lawsuit, or, going to trial 40% of the ultimate gross settlement or judgment following the trial and any appeal undertaken by the adversary. *Additionally, in PIP (Personal Injury Protection) reimbursement cases and where Malher* [sic] *or Winters*[2] *fees are applicable, Attorney earns additional appropriate fees from the first party carrier from the medical payment portion of the proceeds of the settlement.*

*Id.* (FOF 14 (quoting Ex. 382), 15 (quoting Ex. 280)) (emphasis added) (footnotes and formatting omitted).

In the 16 client matters at issue in this case, Feyissa collected *Mahler* fees on top of the 33.3-40 percent contingent fee provided for in the fee agreement. Feyissa took *Mahler* fees in 6 cases where the fee agreement did not contain the *Mahler* provision at all. In 2 cases, he collected the *Mahler* fee on lien amounts unrelated to PIP benefits, making the provision inapplicable. He also took the full *Mahler* fee in some cases where the insurer had waived or reduced its PIP lien.

---

[2] A "*Winters* fee" is similar to a *Mahler* fee but applies in PIP cases involving an underinsured at-fault party. *Winters v. State Farm Mut. Auto. Ins. Co.*, 144 Wn.2d 869, 31 P.3d 1164 (2001).

After charging *Mahler* fees, Feyissa's percentage of the client's total settlements ranged from 41-59 percent, exclusive of costs. *Id.* at 895-96 (FOF 20), 978-81 (Ex. A - HO's Summ. Chart of Resp't's Fee Charges); Ex. 10.5. In total, Feyissa took over $48,500 in fees above the stated percentage in the fee agreements. Ex. 10.5; CP at 978-81.

Feyissa's final accountings to his clients did not make clear to whom the *Mahler* fee was being paid. They listed the *Mahler* fee as a separate line item from the line item for attorney fees, even though Feyissa himself took that money. The *Mahler* fee line items were worded vaguely and often made it appear that the insurer was the recipient of the fee.

Feyissa also made false statements to insurers and medical providers in multiple cases. He frequently misrepresented the amount of settlements to try to induce providers to waive or lower their outstanding bills. It often worked. He sometimes falsely asserted that his firm was waiving or lowering its fee to help compensate the client, in attempts to induce insurers and medical providers to waive liens or lower bills. *E.g.*, CP at 918-19 (FOF 109-111).

Client AW's automobile accident personal injury case provides an illustrative example of this conduct. AW's fee agreement did not contain the *Mahler* provision. Ex. 51. In October 2014, AW received an arbitration award of $18,840.04. Ex. 54.

In November, Feyissa made several false statements to GEICO, the insurer who paid AW's PIP benefits. He falsely stated that AW's award was only $11,500.00 and that legal fees exceeded $9,000.00, and asked GEICO to waive its $8,004.00 claim for PIP reimbursement. Exs. 55, 61; 1 VRP at 89. The same letter falsely stated that Feyissa had agreed to reduce his fees and costs to help AW receive fair compensation. Ex. 55. In response, GEICO agreed to accept $500.00 to satisfy its lien. Exs. 60, 63, 66. AW's final accounting did not show that GEICO had accepted a reduced lien of $500.00, that Feyissa had paid GEICO $500.00, or that Feyissa retained $3,129.11 of AW's settlement as *Mahler* fees in addition to the $7,616.16 he collected as attorney fees. Instead, the final accounting listed a line item of $4,129.11, ambiguously labeled "Mahler or Winters' fees and discount by GEICO. (GEICO subrogation lien – reduced from $8,004.00)." Ex. 66.

Around August 2019, Feyissa's former paralegal, Teena Quichocho, filed a grievance against him with the Bar. CP at 900 (FOF 47). In the grievance, Quichocho alleged that Feyissa had stolen money from clients; had directed her to lie to clients, insurers, and medical providers for his benefit; and had improperly charged clients the full *Mahler* fee even when the insurer had reduced or waived the PIP reimbursement amount. Ex. 2. She attached client documents and e-mails substantiating these claims. *Id.*

6

II.     Feyissa creates false declarations for three clients named in the grievance

ODC began an investigation of Quichocho's grievance. In a September 6, 2019, letter, ODC directed Feyissa to retain all records, files, and accounts related to the grievance. CP at 902 (FOF 55).

Shortly after receiving the grievance, Feyissa sought advice from a mentor, J.D. Smith, a personal injury lawyer. *Id.* (FOF 56). Smith disagreed with Feyissa's interpretation of *Mahler* and advised Feyissa to refund the *Mahler* fees to his former clients. *Id.* (FOF 56-57). During this conversation, Smith did not sense that Feyissa was "intentionally cheating." *Id.* (FOF 57). Based on Smith's testimony, the HO found that up until this point, Feyissa subjectively believed that his *Mahler* provision accurately reflected the holding of that case, and that this conversation was his first notice that "he had misread *Mahler*." *Id.* (FOF 59).

In October 2019, Feyissa contacted three of the clients referenced in the grievance: AW, GT, and SR. Feyissa sent a text to each client stating that "there may be some confusion (with Mahler subrogation fees) when we disbursed your final payment." Exs. 69, 87, 114. He told the clients that he could not find the hard copies of their files and asked if they could look for their fee agreements. *Id.* After confirming the clients no longer had their original fee agreements, Feyissa drafted declarations for each client's signature stating, in relevant part:

> I recall signing a contingency fee agreement exactly similar to the one attached herein showing the Mahler fees and PIP subrogation. **I HAVE LOST THE COPY OF THE FEE AGREEMENT WE SIGNED, but I am certain that it's the exact similar to the fee agreement attached herein**. Mr. Feyissa has explained to me the contents of the fee agreement in detail before I signed.

Exs. 68, 85, 115. Attached to each declaration was a revised contingency fee agreement with the client's name on it and—critically—Feyissa's *Mahler* provision. Exs. 68, 85, 115. The three clients signed the declarations on October 9, 2019, and Feyissa gave each client a check refunding the *Mahler* fee. 4 VRP at 1099 (AW); 3 VRP at 694-95 (GT); Ex. 115 (SR).

The three declarations, however, were false: AW's, GT's, and SR's original fee agreements did not contain the *Mahler* provision. CP at 914 (FOF 98); Exs. 51, 76, 93.

Feyissa concedes that the declarations are false. 12 VRP at 2663 (Feyissa's counsel stated in closing, "[S]o we agree obviously the declarations weren't true.").

And unchallenged findings of fact establish that Feyissa knew the three declarations were false: on October 9, 2019, he had access to the original electronic fee agreements for AW and GT. CP at 914 (FOF 96). He inserted the *Mahler* provision into GT's original electronic fee agreement to create the revised fee agreements attached to the AW, GT, and SR declarations. *Id.* (FOF 98).

Unchallenged findings of fact also establish that Feyissa intentionally created the documents and induced the clients to sign them "to create better factual—but false—evidence and induce what he thought would be favorable testimony from his former clients," *id.*, and "for the purpose of creating falsified evidence in his favor for use in the disciplinary proceeding." *Id.* at 915 (FOF 100).

Sometime in October 2019, Feyissa gave the false declarations and attached fee agreements to his attorney. 7 VRP at 1615. Feyissa also refunded several other clients' *Mahler* fees around this time. CP at 906 (FOF 69).

III.    Feyissa's responses to ODC's document requests omit key files in his possession and contain false statements

On October 18, 2019, Feyissa's counsel responded to the grievance. Counsel asserted that Feyissa "*cannot locate files for the clients whose documents* [*Quichocho*] *attached to the grievance*" and asserted that Quichocho stole those files. Ex. R558 (emphasis added). The letter continues, "As mentioned above, *Mr. Feyissa cannot locate his files for these former clients* even though he does have closed files for other clients from the same time period. However, the fees appear to be consistent with the fee agreement he has used for years, which entitles him to Mahler/Winters fees in addition to the fee charged on the gross settlement amount." *Id.* (emphasis added). The italicized portions of these statements are false, since

Feyissa had access to the original electronic fee agreements of GT and AW at this time, as discussed above. CP at 914 (FOF 96).

On February 13, 2020, ODC sent an "Additional Request for Response to Grievance" seeking "all financial records" and "all correspondence" related to clients mentioned in the grievance, including AW, GT, and SR. Ex. 3.

On October 16, 2020, Feyissa's counsel filed an ELC 5.6 motion objecting to that request.[3] CP at 905 (FOF 64 (citing Bar File number (BF) 39, Ex. B)). On December 7, 2020, the chief hearing officer denied the motion and ordered Feyissa to produce the requested documents within 30 days. Ex. 4; CP at 905 (FOF 67).

On January 20, 2021, Feyissa's counsel responded to ODC's February 13, 2020, additional request. CP at 905-06 (FOF 68); Ex. R560. Feyissa was copied on the correspondence. Ex. R560. Feyissa's counsel submitted a flash drive that she stated "contains the documents Mr. Feyissa has been able to locate. There are documents that he has not been able to find, likely because Ms. Quichocho stole them." *Id.* The flash drive did not contain either the original electronic fee

---

[3] In March 2020, ODC requested that Feyissa's counsel "hold off on filing any motions in this matter for now" because of the emerging coronavirus pandemic and stay-home orders. Ex. R512. Feyissa challenges FOF 63, CP at 904, which found that "[c]ounsel for the parties agreed that due to the pandemic, there would be an extension of time for Respondent's motion to the Chief Hearing Officer pursuant to ELC 5.6(b)." But the record supports the finding that Feyissa's counsel agreed to ODC's request to seek an extension of time to file the motion. Ex. R563.

agreements for AW or GT, or the false declarations that Feyissa created in 2019 for AW, GT, or SR, even though those documents were all responsive to ODC's February 13, 2020, request. Ex. 3.

The cover letter submitted with the flash drive also contained false statements. In the cover letter, Feyissa's counsel stated, "Mr. Feyissa's fee agreement permits him to collect Mahler and similar fees in addition to his contingency fee. When he was unable to find the fee agreements for [AW, GT, and SR], in an abundance of caution, he chose to refund that portion of his fees." *Id*. The assertion that Feyissa was unable to find the original fee agreements for AW and GT is false, as described above.

On February 19, 2021, ODC sent a second Additional Request for Response to Grievance. Among other things, this request sought documents related to the *Mahler* fee refunds referenced in Feyissa's January letter. CP at 906 (FOF 70 (citing Ex. 5)).

On March 22, 2021, Feyissa's counsel responded, copying Feyissa. Ex. 6. In this response, Feyissa's counsel produced the October 9, 2019, false declarations and revised fee agreements for AW, GT, and SR. *Id.* Counsel also attached text messages between Feyissa and AW, SR, and GT relating to the refunds and the declarations. *Id.*

This letter also contains false statements. The letter states with regard to the refunds, "Mr. Feyissa used the disbursement statements for each client as well as documents attached to the grievance to calculate the amount of the refunds and also looked at copies of checks. He does not know exactly which documents he looked at for each client, *but he did not use any documents that you do not already have*." *Id.* (emphasis added). This is false because Feyissa used GT's original electronic fee agreement to create the false reconstructed fee agreements for AW, GT, and SR, as discussed above, and at this point he had not produced GT's original electronic fee agreement. The letter also restates a previous falsehood: "When [Feyissa] was unable to find the fee agreements for [AW, GT, and SR], in an abundance of caution, he chose to refund that portion of his fees." *Id*.

IV.   Lisa Fanning files a second grievance against Feyissa

Meanwhile, massage provider Lisa Fanning filed a second grievance against Feyissa. Fanning treated Feyissa client MW. Fanning sent Feyissa a bill for $999 for massage services provided between November 2016 and January 2017 and kept in touch with Feyissa about her outstanding bills. CP at 933 (FOF 163).

On March 19, 2019, Feyissa settled MW's case for $9,000.00. *Id.* (FOF 164). Later that day, Feyissa e-mailed Fanning, falsely stating that he was "'trying to settle

the case'" and that "'[t]hey are offering $2,312.44 as total settlement.'" *Id.* (FOF 164 (citing Ex. 490)), 933-34 (FOF 165).

Fanning declined to reduce her bill and maintained that she was owed $999.00. *Id.* at 934 (FOF 166). On April 1, 2019, Feyissa sent her an e-mail stating, in part, "You are one incredibly unreasonable, vicious and quiet [sic] honestly insane person!! . . . . If you stop this drama, we are going to send you a check for $500.00 and then move on! If you insist on sending my client to collection, or continue your threat and belligerent rant, then we will respond with have [sic] you be investigated for your practice." *Id.*; Ex. 493. Feyissa disbursed MW's settlement funds on March 29, 2019, and held $1,000.00 in trust for the Fanning bill, intending to negotiate it. CP at 934 (FOF 167).

Over eight months later, Feyissa told Fanning he would send her a check for $1,000 as satisfaction for her bill. Ex. 494. Fanning responded that the check should be for $999. *Id*. Feyissa mailed a check for $1,000; Fanning mailed it back with a note demanding a check for the correct amount. Exs. 495, 496. On December 16, 2019, Feyissa sent Fanning a check for $999 with a note attached that read, in part, "you are one horrible useless incompetent and stupid waste of a human." Ex. 498.

The insulting language in the note motivated Fanning to file a Bar grievance. 4 VRP at 1075. Fanning was concerned that Feyissa would treat other providers similarly. *Id.*

V.      Bar files and amends "Formal Complaint" and obtains discovery order

On October 4, 2022, ODC filed its Formal Complaint. CP at 218-55 (BF 3). On January 25, 2023, ODC filed a "Second Amended Formal Complaint." *Id.* at 309-45 (BF 23). Feyissa filed an amended answer on April 24, 2023. *Id.* at 458-84 (BF 51).

In May 2023, ODC filed a "Motion to Allow Discovery Under ELC 10.11(c)" to obtain the complete client files for the 16 clients named in the complaint. *Id.* at 910 (FOF 85). In a May 15, 2023, declaration submitted in opposition to ODC's motion, Feyissa stated, "I have looked at the files on my computer and I do not have anything that was requested by ODC during its investigation that was not already provided." Ex. 17. He continued, "I do not have any physical files for the five clients whose files are missing . . . . Those clients are called AW, GT, [SR], AM and HS in the formal complaint." *Id.*

On May 17, the HO granted ODC's motion. CP at 910 (FOF 87). ODC subsequently issued "Requests for Production of Documents and Tangible Things." CP at 503. On July 14, 2023, Feyissa responded to ODC's requests for production.

*Id.* at 911-12 (FOF 88). He produced three boxes of physical client files, which included the client files for AW, GT, SR, AM, and HS. These files included the original, signed, hard copy fee agreements for those clients, none of which contained the *Mahler* provision. Feyissa also produced additional documents, including e-mails and electronic files, which he admitted during the hearing were responsive to the chief hearing officer's much earlier December 2020 order. *Id.* (citing 10 VRP at 2444-53; Exs. 142, 208, 433, 230). Those electronic files finally included the original electronic fee agreements for GT and AW, which also did not contain the *Mahler* surcharge provision. *Id.* at 912 (FOF 92-94).

Feyissa's July 2023 production of documents revealed that the original fee agreements for AW, GT, and SR never contained the *Mahler* provision. This meant that the October 2019 declarations Feyissa prepared for those clients were false. By looking at the Microsoft Word properties tab for the electronic fee agreements of AW and GT, ODC determined that on October 9, 2019, Feyissa had access to those original electronic fee agreements and that he inserted the *Mahler* provision into GT's original electronic fee agreement to create the revised fee agreements attached to the AW, GT, and SR declarations. *Id.* at 914 (FOF 96, 98).

In response to this discovery, ODC amended the complaint to add a count of submitting false evidence. The operative "Third Amended Formal Complaint

(Complaint)," CP at 565-607 (BF 125), charged Feyissa with the following counts

of misconduct:

## COUNT 1

485.   By committing the crime of theft and/or converting client funds, Respondent violated RPC 1.15A(b), RPC 8.4(b) (by committing the crime of theft, RCW 9A.56.020(1)(a), 9A.56.010(23)(b)), and/or RPC 8.4(c).

## COUNT 2

486.   By making false representations to one or more insurance providers and/or third parties personally and/or through Quichocho, Respondent violated RPC 8.4(a), RPC 4.1, and/or RPC 8.4(c).

## COUNT 3

487.   By failing to give one or more clients reasonable and fair disclosure of material elements of the fee agreement, by misrepresenting the amounts of subrogation liens against one or more client's recoveries, and/or by making one or more misrepresentations as to whom the "Mahler" and/or other fees would be paid, Respondent violated RPC 1.4(a), RPC 1.4(b), RPC 1.5(c)(3) and/or RPC 8.4(c).

## COUNT 4

488.   By charging and/or collecting unreasonable fees, Respondent violated RPC 1.5(a).

## COUNT 5

489.   By failing to maintain disputed funds from MeA's settlement in trust until the dispute with GEICO was resolved, Respondent violated RPC 1.15A(g).

## COUNT 6

490.   By submitting false evidence to ODC during a grievance investigation, Respondent violated RPC 8.1(a), RPC 8.4(c), and/or RPC 8.4(*l*) (by violating ELC 1.5 and/or ELC 5.3).

. . . .

**COUNT 7**

518. By lying to Fanning about what MW's insurer was offering to settle MW's case, Respondent violated RPC 4.1(a) and RPC 8.4(c).

**COUNT 8**

519. By failing to promptly pay to a third person what the third person was entitled to receive, Respondent violated RPC 1.15A(f).

*Id.* at 604-05, 607.

VI.    Hearing, Board order, and appeal

A 12-day hearing was held before HO Janice Sue Wang between April 15 and April 29, 2023. Numerous witnesses testified, including seven former clients, the two grievants, several experts, and Feyissa.

On September 10, 2024, the HO issued a 90-page amended decision dismissing counts 1 and 5 and finding that ODC had proved the remaining counts by a clear preponderance of evidence. *Id.* at 887-981. The HO determined that seven aggravating factors applied and three mitigating factors applied. *Id.* at 968-70 (conclusions of law (COL) 279-285), 971-72 (COL 287, 291-292). She recommended disbarment based on Feyissa's "creation and submission of the false declarations of AW, GT and SR, the numerous acts of deceptive testimony about his client files, and his bad faith obstruction of discovery during the disciplinary process." *Id.* at 974 (SA 300). The HO found that this misconduct overrode any mitigating factors. *Id.* Without this misconduct, the HO "would have been willing to

17

recommend a suspension of 18 months followed by a 2-year probationary period with a practice monitor" as an adequate sanction. *Id.* (SA 299).

Feyissa timely appealed the amended decision. CP at 982-83 (BF 194). After briefing and oral argument, the Board unanimously adopted the decision and disbarment recommendation. Decision Papers (DP) at 210-11 (BF 218).

Feyissa now appeals to this court. *Id.* at 212-13 (BF 219). He makes 45 assignments of error. First, he argues that the Board erred in affirming the amended decision because of "appeals to racist tropes." Appellant's Opening Br. at 2. Second, he argues that the Board erred in affirming the amended decision because the hearing was not fundamentally fair. *Id.* He next assigns error to 54 of the findings of fact, to the Board's decision to affirm the HO's conclusions of law and sanction analysis for counts 2, 3, 4, 6, and 8, and to the HO's recommendation of disbarment. *Id.* at 2-5. He asks this court to dismiss counts 3, 4, and 6 and to order a new hearing on counts 2 and 8. *Id.* at 1, 6. Feyissa also argues that the chair of the Board abused her discretion in assessing $34,524.13 in court reporter costs against him and asks this court to reduce the court reporter costs by $8,983.98. *Id.* at 110; Resp't's Exception to Am. Cost Statement (BF 224).

18

ISSUES

I.    Is Feyissa entitled to a new hearing on the ground that racial bias affected the decision? [Short answer: No.]

II.    Was the hearing fundamentally unfair for other reasons? [Short answer: No.]

III.    Are the HO's findings of fact supported by substantial evidence, and do the findings of fact support the conclusions of law? [Short answer: Yes. Substantial evidence supports most of the findings of fact, and those findings support the conclusions of law. The erroneous findings of fact are harmless.]

IV.    Did the HO err in the sanction analysis, including the analysis of mitigating and aggravating factors? [Short answer: No.]

V.    Is the recommended sanction of disbarment proportionate to the most serious misconduct? [Short answer: Yes.]

VI.    Did the Board chair abuse her discretion in denying respondent's challenge to ODC's cost bill? [Short answer: No.]

STANDARD OF REVIEW

"This court has the ultimate responsibility for disciplining lawyers." *In re Disciplinary Proc. Against Van Camp*, 171 Wn.2d 781, 797, 257 P.3d 599 (2011) (citing *In re Disciplinary Proc. Against Preszler*, 169 Wn.2d 1, 15-16, 232 P.3d 1118 (2010)); ELC 2.1. We have, however, delegated certain responsibilities to the Bar. *In re Disciplinary Proc. Against Thi Anh Huynh*, 3 Wn.3d 648, 658, 555 P.3d 398 (2024) (citing *In re Disciplinary Proc. Against McKean*, 148 Wn.2d 849, 861, 64 P.3d 1226 (2003)); ELC 2.5. An attorney is entitled to a disciplinary hearing at which the Bar must prove each count of misconduct by a clear preponderance of the

evidence. *In re Disciplinary Proc. Against Poole*, 156 Wn.2d 196, 209, 125 P.3d 954 (2006); ELC 10.14(b). Following the hearing, "a hearing officer makes findings of fact, conclusions of law, and initial recommendations to the Board, who then reviews those recommendations and makes a decision that can be appealed to this court." *Huynh*, 3 Wn.3d at 658.

Unchallenged findings of fact are verities on appeal. *In re Disciplinary Proc. Against Marshall*, 160 Wn.2d 317, 330, 157 P.3d 859 (2007) (citing *In re Disciplinary Proc. Against Longacre*, 155 Wn.2d 723, 735, 122 P.3d 710 (2005)). We uphold challenged findings of fact if they are supported by substantial evidence in the record. *Id.* (citing *Poole*, 156 Wn.2d at 208). "Substantial evidence" is evidence sufficient "'to persuade a fair-minded, rational person of the truth of a declared premise.'" *Poole*, 156 Wn.2d at 209 n.2 (internal quotation marks omitted) (quoting *In re Disciplinary Proc. Against Bonet*, 144 Wn.2d 502, 511, 29 P.3d 1242 (2001)). We give "great weight" to the hearing officer's evaluations of witness credibility and of the lawyer's state of mind. *Marshall*, 160 Wn.2d at 330 (citing *Longacre*, 155 Wn.2d at 735).

"We review conclusions of law de novo and will uphold them if they are supported by the findings of fact." *Id.* (citing *In re Disciplinary Proc. Against Cohen*, 150 Wn.2d 744, 754, 82 P.3d 224 (2004)). When the Board is "unanimous with regard to the recommended sanction, we will uphold its decision absent a clear

reason for departure." *In re Disciplinary Proc. Against Placide*, 190 Wn.2d 402, 416-17, 414 P.3d 1124 (2018) (citing *In re Disciplinary Proc. Against Fossedal*, 189 Wn.2d 222, 233, 399 P.3d 1169 (2017)).

ANALYSIS

I.     Feyissa fails to show that a new hearing is required based on racial bias

Feyissa's primary argument is that this court should order a new hearing because the first hearing was affected by racial bias. Specifically, he argues (1) that the HO displayed racial bias and (2) that ODC counsel repeatedly referenced racial stereotypes and elicited irrelevant testimony that called on those stereotypes. For the following reasons, we reject those arguments.

A. Standard of review for claims of bias

An attorney in a disciplinary proceeding is entitled to a hearing before a hearing officer who is not only fair but who appears to be fair. *In re Disciplinary Proc. Against Haskell*, 136 Wn.2d 300, 314, 962 P.2d 813 (1998). "In determining if a proceeding appears to be fair, the critical concern is how it would appear to a reasonably prudent and disinterested person." *Id.* (citing *Chi., Milwaukee, St. Paul, & Pac. R.R. Co. v. Hum. Rts. Comm'n*, 87 Wn.2d 802, 557 P.2d 307 (1976)). "Hearing officers shall perform their duties without bias or prejudice." ELC 2.6(d)(1)(E). "A hearing officer is presumed to be impartial, and a party who alleges

bias must affirmatively establish his or her claim based on facts in the record, not bald accusations, speculation, or innuendo." *In re Disciplinary Proc. Against Jackson*, 180 Wn.2d 201, 221-22, 322 P.3d 795 (2014) (citing *In re Disciplinary Proc. Against King*, 168 Wn.2d 888, 904-06, 232 P.3d 1095 (2010)). When analyzing a claim of hearing officer bias or lack of appearance of fairness, we consider the record as a whole. *Haskell*, 136 Wn.2d at 317.

We have not yet addressed whether a different standard applies when an attorney argues that racial bias affected a hearing officer's decision in a disciplinary proceeding.

Feyissa argues that we should apply the standard from *Henderson v. Thompson*, 200 Wn.2d 417, 518 P.3d 1011 (2022). In *Henderson*, we held that in ruling on a motion for a new civil trial under CR 59, "'[t]he ultimate question for the court is whether an objective observer (one who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State) could view race as a factor in the verdict,'" considering the totality of the circumstances of the trial. *Id.* at 422 (alteration in original) (quoting *State v. Berhe*, 193 Wn.2d 647, 665, 444 P.3d 1172 (2019)), 439. *Henderson* also adopted a two-step framework for assessing a CR 59 motion for a new trial on this basis: once a civil litigant "makes a prima facie showing sufficient to draw an inference of racial bias under this standard, the court must grant an

evidentiary hearing to determine if a new trial is warranted." *Id.* at 435 (citing *Berhe*, 193 Wn.2d at 665-66). If the party seeking to preserve the verdict cannot show that racial bias had no effect on the verdict, then the court should order a new trial under CR 59(a)(9). *Id. Henderson*'s reasoning was rooted in the right of criminal and civil litigants "to a trial by an unbiased jury." *Id.* at 434.

It is just as important to combat racial bias in the attorney disciplinary context as in any other context. However, Feyissa has not adequately explained why the *Henderson* standard, developed in the context of a CR 59 motion for a new trial in a civil case tried to a jury, should be applied to the unique context of an attorney disciplinary proceeding. "[D]isciplinary proceedings are neither civil nor criminal but are sui generis hearings to determine if a lawyer's conduct should have an impact on the lawyer's license to practice law." ELC 10.14(a). Unlike civil and criminal cases, there is no right to a jury trial in an attorney disciplinary proceeding, and the ELCs do not provide a procedure equivalent to the CR 59 motion for a new trial.

Feyissa does not explain why, or how, the *Henderson* framework should apply here given these significant differences. We therefore leave the question of whether to change our current standard for evaluating a claim of racial bias in the disciplinary proceeding context for another day.

B. Feyissa fails to demonstrate that racial bias was a factor in the HO's disbarment recommendation

Feyissa argues that "the Hearing Officer's reliance on cultural stereotypes, ignoring testimony from black witnesses that contradicted white witnesses, refusal to consider cultural differences, and her prohibition against offering relevant evidence that referenced race, demonstrates that the decision did not achieve substantial justice" under the *Henderson* standard. Appellant's Opening Br. at 19. Considering the totality of the circumstances and the record as a whole, we reject Feyissa's characterization of the record and his argument.

### i.    *Feyissa's claim that HO relied on cultural stereotypes*

Feyissa first challenges the HO's ruling that one instance of improper outside interference with a witness's remote testimony amounted to no more than harmless error. Feyissa argues that this ruling was based on a cultural stereotype and tainted the proceedings with racial bias.

This argument stems from the Bar's decision to call Feyissa's former client AW to testify remotely. 4 VRP at 1088-1106. During direct examination, it became apparent that AW's husband was in the room and that he was speaking to her. *Id.* at 1094. On cross-examination, Feyissa's counsel asked whether AW had been speaking to her husband; AW said no, but her husband audibly responded, "Yes." *Id.* at 1105.

After AW testified, Feyissa's counsel expressed concern that AW's husband had been speaking to her during the testimony. *Id.* at 1106. Following up on this concern, ODC moved—the next day—to strike AW's testimony completely. 5 VRP at 1206-08. Feyissa's counsel opposed the motion to strike "because [the husband] did not say anything until [AW] was done testifying in the Bar's case." *Id.* at 1208. Feyissa's counsel also said she was "not concerned because the interference happened after [AW] testified," *id.* at 1209, and continued, "I'm willing to put on the record that we would not raise on appeal any issue about interference with the witness while—during the Bar's questioning of her." *Id.* at 1210. The HO then denied ODC's motion to strike. *Id.* at 1207, 1210.

Several days later, however, Feyissa's counsel retracted her statement that she would not raise an issue on appeal about AW's testimony. 8 VRP at 1962-63. In response, ODC renewed its motion to strike. *Id.* at 1966. ODC counsel explained that AW's husband had refused to leave the room during AW's testimony and that everyone had heard the husband "yelling at his wife, who you could see was visibly upset by the yelling." *Id*. The HO responded, "I understand. And I also understand some cultures [sic] that men are very protective of their wives." *Id*. The HO continued, "I understand that this could be—my sense is this probably is some sort of a cultural issue, but it sounds like harmless error to me and I will leave it at that

and if there is an issue to be brought later on, so be it." *Id.* at 1968. She denied the motion to strike. *Id.*

Feyissa argues that the HO relied on a cultural stereotype in ruling that the husband's interference reflected protectiveness and constituted at most harmless error. But even if the HO's reasoning concerning the husband's interference was misinformed, Feyissa does not show how the HO's ultimate ruling—that the wife's testimony was admissible, as Feyissa continually argued—requires reversal. The Bar was the party that moved to strike AW's testimony because of the interference. Feyissa was the party who requested that the HO deny the Bar's motion to strike—and the HO did so, twice.

Thus, even if the HO's *reasoning* was incorrect, Feyissa does not show that the HO's *ruling* constituted error, much less prejudicial error.[4]

---

[4] Apart from the claim of racial bias, Feyissa also argues more generally that the events surrounding AW's testimony rendered the proceeding unfair and entitle him to a new hearing. We reject this argument since Feyissa invited any error by objecting twice to the Bar's motions to strike its own witness AW's testimony. "Under the invited error doctrine, a party may not set up an error at trial and then complain of it on appeal." *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 774, 320 P.3d 77 (2013) (citing *In re Pers. Restraint of Thompson*, 141 Wn.2d 712, 723, 10 P.3d 380 (2000)). The doctrine applies when, as here, a party "takes affirmative and voluntary action that induces the trial court to take an action that party later challenges on appeal." *Id.* (citing *Thompson*, 141 Wn.2d at 723-24).

### ii. *Feyissa's claim that HO ignored testimony*

Feyissa next argues that the HO ignored testimony from Black witnesses and showed bias in favor of white witnesses. He argues that the HO's written decision implies that Feyissa called only Dr. Tutty, who is white, as an expert witness regarding Feyissa's depression, and ignored the testimony of Dr. Asressahegn, who is Black. Appellant's Opening Br. at 23.

But Dr. Asressahegn, a friend of Feyissa's, did not treat Feyissa, did not submit an expert report, and provided an opinion on Feyissa's depression as a friend, without following the normal diagnostic process. 7 VRP at 1728-29. Those facts differentiated the two doctors' testimony and weigh against concluding that the HO's focus on Dr. Tutty's expert testimony showed bias.

Feyissa argues that the HO's decision ignored testimony from two other Black witnesses. Frederick Thompson, Quichocho's ex-boyfriend, testified (negatively) about Quichocho's credibility. But the HO did not ignore that testimony or other testimony relating to Quichocho's credibility. CP at 901 (FOF 50). Instead, the HO limited her finding that Quichocho testified credibly to her testimony concerning—and supported by—the documentary evidence relating to the charges in the complaint. *Id.* (FOF 49). The HO's credibility determinations are entitled to great weight, and we find no reason to disturb that limited determination here.

Similarly, Feyissa argues that the HO's decision ignored testimony from a Black witness, Ricci Greenwood, tending to undermine former client GT's credibility, and thereby incorrectly ruled that GT was credible. Appellant's Opening Br. at 23. But as the Bar points out, the HO did not make any credibility finding at all about GT. Answering Br. of ODC of Bar (Answering Br.) at 42. Instead, the HO made findings about GT's final accounting and the false declaration that Feyissa crafted for GT; those findings were unrelated to Greenwood's testimony undermining GT's honesty about her medical condition. *Id.*; CP at 934-37 (FOF 176-179).

Notably, Feyissa's friends and relatives, many of whom were Black, testified at the hearing, particularly about Feyissa's depression during the relevant time period. Another friend of Feyissa's, who is Ethiopian and does business with Ethiopian companies, testified about differences between Ethiopian and Western cultures in terms of business practices. The HO found these witnesses' testimony credible. The record does not support Feyissa's argument that the HO ignored the testimony of Black witnesses.

iii.    *Feyissa's claim that HO refused to consider cultural differences*

Feyissa claims that the HO refused to consider cultural differences. But the record contradicts that assertion, too.

28

As stated above, Feyissa's friend testified about cultural differences between Ethiopian and Western cultures relating to norms in negotiations. The witness opined that "in Ethiopia, 'If you tell a lie but everybody's happy, then you didn't do anything wrong.'" CP at 973 (SA 296). The HO clearly did not refuse to consider this testimony or to evaluate its impact on the case, as evidenced by her conclusion of law on the issue; the HO made the sustainable legal conclusion that this cultural difference "does not exempt Respondent from his professional obligations under the RPCs, and thus cannot be accepted as a reason to mitigate Respondent's conduct as a lawyer." *Id.*

> iv. *HO's supposed prohibition on offering relevant evidence that referenced race*

Feyissa argues that the HO rejected relevant testimony related to race and ethnicity from Dr. Britton, a chiropractor who treated one of Feyissa's clients. Appellant's Opening Br. at 26. The record shows just the opposite.

Dr. Britton testified that he had been hesitant to cooperate with the Bar's investigation at first because he didn't want to be involved with someone losing their license. 4 VRP at 997. When Bar counsel asked if Dr. Britton was "concerned about testifying today," Dr. Britton responded that if the proceeding resulted in Feyissa losing his livelihood, that would be "a reason for concern." *Id.* at 996. The Bar continued,

Q. Were you concerned for yourself or concerned for Mr. Feyissa?

A. In my—in this case for myself. I don't have proper vision, so I wouldn't recognize him if he was 15 feet away from me. I know he's over there, but I can't see any description of him or anything like that.

So I don't know if that helps me or not, but, you know, I think that I could jeopardize his ability to make money moving forward, and I don't—and I was initially hesitant because I'm not looking for that.

*Id.* at 996-97. (Dr. Britton had previously testified he was legally blind in one eye. *Id.* at 949.) The Bar asked no further questions on this topic. *Id.* at 997.

On cross-examination, Feyissa's counsel—not Bar counsel—repeatedly asked Dr. Britton whether he was physically afraid of Feyissa. *Id.* at 1006-09. She began by asking whether Feyissa "seem[ed] to be a violent man" when Dr. Britton met with him in his office. *Id.* at 1007. Dr. Britton responded, "No." *Id.*

Feyissa's counsel next asked, "And were you able to observe his skin color when you met him?" *Id.* Dr. Britton responded, "Yes." *Id.* At that point, Feyissa's counsel stated:

Q. Okay. I would like to ask that Mr. Feyissa stand next to the witness so the witness—because the witness has poor vision so he can see whether he was accurate when he said that he and Mr. Feyissa have the same skin tone.

*Id.* The HO sustained ODC's objection on relevance grounds. Feyissa's counsel continued:

[FEYISSA'S COUNSEL]: Okay. I would like the record to be clear that Mr. Feyissa is significantly darker in skin tone than Dr. Britton.

THE WITNESS: We are both a brown skin tone.

*Id.* at 1008. Feyissa's counsel continued her line of questioning about whether Dr. Britton was physically afraid of Feyissa:

Q. Okay. So my question was are—were—is your testimony that you're afraid that Mr. Feyissa is going to do something violent against you?

A. I don't want to risk that possibility.

Q. So you think there's a possibility that Mr. Feyissa is going to physically harm you. Is that your testimony?

A. There's a possibility.

Q. Okay. Are you aware that there is a racist stereotype about that black men are violent?

A. I am white and black, so where are you coming from?

Q. I am just asking you if you are aware of that racist stereotype.

*Id.* at 1009. ODC objected based on relevance. The HO stated, "I'm going to sustain this objection . . . . I don't want you to be raising race and interjecting that in this hearing. It's going to conclude now." *Id.*

Viewed in context, the HO's statement was not a refusal to admit relevant testimony about race. Instead, it was a permissible decision to sustain the Bar's objection to a specific line of questioning that Feyissa's counsel continued to pursue despite Dr. Britton's prior testimony that he did not think Feyissa was violent.

31

Further, the record as a whole shows that the HO did permit relevant testimony regarding race and ethnicity. *See, e.g.*, 8 VRP at 1933-37 (lay witness testimony about Ethiopian cultural norms); 5 VRP at 1433-34 (expert opinion that there is racism in the insurance industry and that may have affected the way insurers communicated with Feyissa).

> v. *Feyissa's argument that factual findings relied on racist tropes or mischaracterized Feyissa's testimony*

Finally, Feyissa assigns error to numerous findings of fact on the ground that they evoke "the racist trope of black men as threatening and violent" by using coded language, mischaracterizing his conduct as hostile, or misattributing testimony to him. Appellant's Opening Br. at 24. He argues that these errors show that the HO's decision was impacted by racial bias.

The HO found that "Respondent's attacks on Ms. Quichocho from the time he became aware of her filing the Grievance, were attempts by him to divert attention from his conduct." CP at 902 (FOF 53). Feyissa argues that the HO's use of the term "attacks" reflects the stereotype that Black men are violent. Appellant's Opening Br. at 24. That argument seriously mischaracterizes the HO's finding. The phrase "attacks on Ms. Quichocho" clearly refers to attempts to damage an opponent's credibility, not to physical violence. The fact that Feyissa sought to attack

32

Quichocho's credibility throughout the investigation is supported by substantial evidence.

The HO found that Feyissa "was unduly aggressive with Dr. Britton." CP at 931 (FOF 156). Feyissa argues this finding was irrelevant and reflects the same stereotype of Black men as violent. But this finding was based on documentary evidence and testimony from Dr. Britton regarding his communications with Feyissa, relevant to count 2. The documentary evidence showed that Feyissa misrepresented the amount of the client's settlement by tens of thousands of dollars to induce Dr. Britton to reduce his lien. It further showed that when Dr. Britton refused, Feyissa called Dr. Britton names and threatened to have Dr. Britton's license investigated. 4 VRP at 962-91. The HO's description of this conduct was reasonable and FOF 156 is supported by substantial evidence in the record. CP at 931.

In FOF 51, the HO described "Respondent's repeated accusations that Ms. Quichocho stole documents from him" as "long a centerpiece of his defense during ODC's investigation and in the subsequent disciplinary proceeding." *Id.* at 901-02. Feyissa argues that this claim was not "a centerpiece" of the hearing and that the finding misattributes hostility to him, showing bias. But one of Feyissa's main arguments during the investigation was that Quichocho stole documents from him. Ex. 26; Ex. R558. Thus, this finding is supported by substantial evidence.

Finally, two of the challenged findings related to this claim are not supported by substantial evidence, but these errors are harmless. In FOF 52, the HO erroneously found that Feyissa "assert[ed] that Ms. Quichocho was precluded from testifying against him under a confidentiality agreement." CP at 902. Feyissa never asserted that Quichocho was precluded from testifying against him on that basis. In FOF 155, the HO erroneously stated that Dr. Britton's office was not aware that there were two tortfeasors in the client's case, when Dr. Britton's testimony was the opposite. *Id.* at 931; 4 VRP at 1017-18. We conclude that these errors are harmless and do not reflect a reliance on racist tropes.

Reviewing the record as a whole, we conclude that Feyissa has not overcome the presumption that the HO was unbiased. *Jackson*, 180 Wn.2d at 221-22.

### C. Feyissa's characterization of Bar counsel's conduct is not supported by the record

Feyissa also argues that he is entitled to a new hearing because the Bar made "repeated references to the racist trope of black men as violent and aggressive" and that the Bar "elicited irrelevant testimony from two witnesses that called on the racist trope of black men as violent and abusive." Appellant's Opening Br. at 18-20. Again, he argues that the standard from *Henderson* should apply. In a statement of additional authorities, he also cites *In re Personal Restraint of Skone*, 30 Wn. App. 2d 1, 33, 543 P.3d 842 (2024), a decision applying this court's case law on

34

prosecutorial misconduct during a criminal trial.[5] Feyissa does not explain the distinction between these two standards or why either of them should apply to his claim in the distinct attorney discipline context. Nor does he address the fact that the record does not support his characterizations about what actually happened with reference to many of his claims of racial bias.

Much of Feyissa's argument on this point relates to Dr. Britton's testimony, discussed above. As stated, the Bar asked Dr. Britton two questions related to his hesitation to cooperate in the investigation. 4 VRP at 997. On cross-examination, Feyissa's counsel repeatedly asked Dr. Britton whether he was physically afraid of Feyissa and then sought to prove that Feyissa's skin tone was darker than Dr. Britton's skin tone. *Id.* at 1006-09. As noted above, she began by asking whether Feyissa "seem[ed] to be a violent man" when Dr. Britton met with him in his office. *Id.* at 1007. Dr. Britton responded, "No." *Id.* Feyissa's counsel continued her line of questioning about whether Dr. Britton was physically afraid of Feyissa until the HO sustained ODC's objection on relevance. *Id.* at 1009.

---

[5] *Skone* applied the standard from *State v. Zamora*, where we held that when determining whether a prosecutor's conduct "'flagrantly or apparently intentionally'" appealed to jurors' racial or ethnic bias, the court asks whether an objective observer could view the prosecutor's statements during voir dire as an appeal to jurors' potential prejudice, bias, or stereotypes. 30 Wn. App. 2d at 34 (quoting *State v. Zamora*, 199 Wn.2d 698, 718-19, 512 P.3d 512 (2022)). In conducting this analysis, the court considers the apparent purpose of the statements, whether the comments were based on the evidence or reasonable inferences in the record, and the frequency of the remarks. *Zamora*, 199 Wn.2d at 718-19.

When viewed in context, the Bar's questioning of Dr. Britton did not call on racial stereotypes. Rather, the Bar asked a relevant question about Dr. Britton's initial hesitation to cooperate in the investigation, then moved on. This exchange does not support Feyissa's argument that the Bar referenced racist stereotypes.

The Bar's questioning of witnesses about specific communications with Feyissa did not reference stereotypes, either. Service providers Dr. Britton and Fanning both testified about text messages and e-mail conversations with Feyissa. Their descriptions of Feyissa's communications with them—for example, Dr. Britton's description of Feyissa's communication in a text exchange as "hotheaded"—enjoy substantial support from documentary evidence in the record. *See* 4 VRP at 962-91, 1064-75. And the testimony was relevant because it related directly to counts 2 and 7. We reject Feyissa's contention that the Bar's questions on these topics, or the Bar's description of this conduct as verbally abusive in closing, was inappropriate.

As mentioned above, Feyissa also argues that the Bar "used the racist trope of black men as violent to discredit" witness Frederick Thompson, Quichocho's ex-boyfriend. Thompson testified that he believed Quichocho was lying about allegations in the grievance against Feyissa. Appellant's Opening Br. at 22; 7 VRP at 1773-80. On cross-examination, Thompson testified that Quichocho filed a false petition for a domestic violence (DV) protection order against him. 7 VRP at 1784-

86, 1788. Thompson testified that Quichocho's lies in the DV petition led him to conclude that she was probably lying in the grievance. *Id.* at 1786.

The Bar then asked Thompson whether other DV protection orders had ever been filed against him. *Id.* at 1789. The HO sustained Feyissa's objection. *Id.* The Bar did not ask any further questions about protection orders. We disagree that the Bar's single question about the additional DV protection orders was an attempt use the racist trope of Black men as violent to discredit Thompson. Instead, the Bar's question about prior DV orders was an attempt to rebut the alleged-false-protection-order basis for Thompson's claim that Quichocho was a liar.

Finally, Feyissa argues that the Bar evoked racial stereotypes when it asked him, during cross-examination, "Do you sometimes get angry and yell at providers?" 10 VRP at 2429. But Feyissa omits the full context of the question, which the Bar asked to clarify what Feyissa meant when he himself testified that he would sometimes "go on off on providers." 9 VRP at 2241.

The record does not support Feyissa's arguments about Bar counsel's conduct.

II.     Feyissa does not show that the hearing was otherwise unfair

Feyissa argues that the hearing was not fundamentally fair for additional reasons unrelated to racial bias. We disagree.

A. Court reporter favoritism

During the hearing, the Bar requested a transcript excerpt from the court reporter. Ex. R557. Early the following day, the court reporter e-mailed an excerpt of the transcript and requested ODC to "keep this under wraps so that [Feyissa's attorney] doesn't know." *Id.* ODC counsel responded, "I did not realize that you had a policy of not providing excerpts during hearings. In the future, please do not make policy exceptions for ODC." *Id.*

Then, at the hearing that day, ODC counsel put the matter on the record. 9 VRP at 2164. Feyissa objected to the court reporter continuing on the case. *Id.* at 2165. The HO did not remove the court reporter from the case. *Id.* at 2166. She directed the court reporter to follow the standards applicable to court reporters, to not provide transcript excerpts to either party during the hearing, and to destroy any existing physical copies of excerpts. *Id.* at 2165-66.

Feyissa argues that this was unfair and that he is entitled to a new hearing. However, he provides no authority to support his argument that court reporter bias or favoritism provides a ground for a new hearing absent any showing of prejudice. Rather, a litigant seeking a new hearing on the ground that a transcript is incomplete or incorrect must usually show prejudice from the defect in the record to obtain relief. *State v. Miller*, 40 Wn. App. 483, 488, 698 P.2d 1123 (1985); *United States*

*v. Anzalone*, 886 F.2d 229, 231-32 (9th Cir. 1989) (defendant seeking reversal based on alleged inaccuracies in transcript must show "specific prejudice" from the alleged inaccuracies to prevail).

Feyissa fails to do so here. He argues that due to the HO's earlier ruling that the parties could not make additional recordings of the proceeding, "it is impossible to determine the extent to which the reporter's bias affected the accuracy of the transcript, but portions of it were not consistent with Respondent counsel's recollection." Appellant's Opening Br. at 32 (citing CP at 760-67 (BF 172)).[6] But he does not identify any specific part of the transcript as inaccurate. Further, Feyissa proposed corrections to the transcript, and the HO ordered many of those corrections. CP at 768-69 (BF 177), 770-82 (BF 181).

The court reporter's offer to provide an excerpt to ODC only and that reporter's request to hide this information from Feyissa were both improper. *See* WAC 308-14-130(1) (court reporters must "[o]ffer arrangements on a case

---

[6] At the beginning of the hearing, the HO ruled that no party would be permitted to make a recording. 1 VRP at 21-22. A hearing officer may "make any ruling that appears necessary and appropriate to insure a fair and orderly proceeding." ELC 10.1(c). A hearing officer's "discretionary decisions are entitled to great weight." *In re Disciplinary Proc. Against Sanai*, 167 Wn.2d 740, 751, 225 P.3d 203 (2009). "Generally, a reviewing court will not disturb a discretionary act absent a showing of manifest abuse of discretion," which occurs "'only when no reasonable person would take the view adopted.'" *Jackson*, 180 Wn.2d at 220 (quoting and citing *In re Disciplinary Proc. Against Whitney*, 155 Wn.2d 451, 465, 120 P.3d 550 (2005)). Feyissa does not show that no reasonable hearing officer would have made that decision.

concerning court reporting services or fees to all parties on equal terms"). But the HO admonished the court reporter not to repeat her improper conduct and ordered all excerpts destroyed. Feyissa fails to identify any inaccuracies in the transcript or argue that they caused him prejudice. *Haskell*, 136 Wn.2d at 313-14. Given these facts, a reasonably prudent and disinterested person would not find the HO's decision unfair.

###### B. Feyissa's claim that HO prejudged the matter

The HO asked the parties to include in their hearing briefs "citations in support of their position as to the appropriateness and proportionality of sanctions sought by ODC, including analysis of any mitigating and aggravating circumstances." Appellant's Opening Br. at 36-37 (emphasis omitted); CP at 616-18 (BF 136). Feyissa's counsel argues that this request shows that the HO decided prior to the hearing that ODC would meet its burden of proving the misconduct alleged in the complaint.

We disagree that the wording of this order was unfair or expressed a presumption that ODC would carry its burden. Further, the fact that the HO ended up dismissing two of the eight counts undermines Feyissa's argument that the HO had prejudged the case.

C. Challenges to findings of fact on the basis that HO relied on evidence outside the record

Feyissa argues that the HO used evidence outside the record to make numerous findings of fact and that this violated his ELC 10.13(d) right to cross-examine witnesses and his due process right to notice and an opportunity to be heard. Appellant's Opening Br. at 37-38.

The documents he refers to as being "outside the record," however, are all documents from the Bar file. In these instances, the HO cited the documents appropriately, either to establish the procedural history of the case or for undisputed factual assertions. Moreover, Bar file documents are part of the record on review, so this court is free to consider them in any case. ELC 12.5(b).

III. The findings of fact support the bulk of the conclusions of law, and any erroneous factual findings are harmless

Feyissa assigns error to several findings of fact, arguing that they are not supported by substantial evidence. He also challenges the entirety of the HO's conclusions of law for counts 2, 3, 4, 6, and 8. We reject these challenges. Substantial evidence supports nearly all the challenged findings of fact; any errors are harmless. In turn, the findings of fact support the HO's legal conclusions. We summarize the factual support for each count below.

Count 2

Count 2 charged Feyissa with making false statements to one or more insurance providers and/or third parties personally or through Quichocho, in violation of RPC 8.4(a), RPC 4.1, and/or RPC 8.4(c). The HO concluded that ODC proved count 2 because "Respondent admitted to making false statements" to third parties in seven cases. CP at 948-49 (COL 214).

Feyissa concedes that he made false statements in five of those cases but argues that there is no evidence that he admitted to making false statements in two cases (AW and SR). Appellant's Opening Br. at 54.

But substantial evidence supports the findings that Feyissa admitted that he made false statements, either personally or through Quichocho, in AW's and SR's cases. In AW's case, Feyissa admitted that the letter to AW's insurer contained false statements, 10 VRP at 2449, and Quichocho testified that Feyissa saw and approved that letter before it went out. 1 VRP at 89. In SR's case, Feyissa admitted that at the time Quichocho sent the letter to SR's insurer, which Feyissa was copied on, he knew that the statements she made were false. 10 VRP at 2450. The HO's findings and conclusions on count 2 were sound.[7]

---

[7] Feyissa also argues that the HO double-counted misconduct by including the false statements made to Fanning in this count, while those statements also formed the basis for count 7. Appellant's Opening Br. at 55. But even without considering those statements as

## Count 3

Count 3 charged Feyissa with violating RPC 1.4(a), RPC 1.4(b), RPC 1.5(c)(3), and/or RPC 8.4(c) by "failing to give one or more clients reasonable and fair disclosure of material elements of the fee agreement, by misrepresenting the amounts of subrogation liens against one or more client's recoveries, and/or by making one or more misrepresentations as to whom the 'Mahler' and/or other fees would be paid."

Feyissa challenges each subpart of this count. Although the HO made two errors in the factual findings related to this count, the errors are harmless and the remaining findings of fact support her conclusion that the Bar proved count 3.

> A. Failing to give one or more clients reasonable and fair disclosure of material elements of the fee agreement

With regard to this subsection of count 3, the HO concluded that Feyissa violated RPC 1.4(b), which provides, "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."[8]

---

part of count 2, the remaining evidence clearly shows that Feyissa made false statements to "one or more . . . third parties" as charged.

[8] The HO found that this part of count 3 applied only to the 10 clients whose fee agreements contained the *Mahler* provision. CP at 949 (COL 216). The HO addressed Feyissa's "mistaken application of the *Mahler* Surcharge Provision" to the remaining 6

Feyissa first argues that the Bar improperly charged him with violating RPC 1.4(b). Appellant's Opening Br. at 59-60. He argues that RPC 1.4(b) does not apply when a prospective client signs a fee agreement. He explains that the Bar was limited to charging him with violating RPC 1.5(b), which requires a lawyer to disclose the rate or basis of a fee "before or within a reasonable time after commencing the representation."

The HO correctly rejected these arguments. Under our controlling precedent, this conduct can form the basis for charging a violation of RPC 1.4(b). *Van Camp*, 171 Wn.2d at 805 (attorney's failure to explain the fee agreement at the time the client signed it violated RPC 1.4(b) because the client "needed sufficient information about the matter (including how the fee was being calculated) to make informed decisions concerning his case"); *see also In re Disciplinary Proc. Against Burtch*, 162 Wn.2d 873, 886, 175 P.3d 1070 (2008) (attorney violated both RPC 1.4(b) and 1.5(b) by failing to "adequately and accurately explain the fee agreement to his client").

---

clients whose fee agreement did not contain the provision in her discussion of count 4. *Id.* at 949 n.38.

B. The factual findings support the conclusion that Feyissa violated RPC 1.4(b), despite two erroneous findings

Feyissa continues that even if RPC 1.4(b) applies to his conduct, the findings of fact do not support the conclusion that he failed to give clients reasonable and fair disclosure of material elements of the fee agreement.[9] Appellant's Opening Br. at 63. Specifically, Feyissa argues that the testimony of two clients, ME and YG, does not support the conclusion that he violated RPC 1.4(b). ME and YG testified that they understood the *Mahler* provision when they signed the agreement. 7 VRP at 1683-84 (ME); 3 VRP at 929 (YG testified, "[H]e explained that to me, and I understood it at that time."). The HO erroneously found that YG "indicated" that he did not understand "the meaning of '*Mahler*'" when he signed the fee agreement. CP at 930-31 (FOF 154).

In challenged FOF 20, the HO found there was "no evidence that Respondent ever advised a client that the *Mahler* Surcharge Provision would operate as a mark-up of the regular, base attorney fee charged to the client." CP at 896. But in unchallenged FOF 181, the HO found that client AA testified that Feyissa explained

---

[9] Feyissa challenges numerous findings of fact related to this count: FOF 20, 112, 117, 130, 131, 133, 154, 160, 176, 177. CP at 895-96, 919-20, 924-25, 930-31, 932-33, 935-36. All but two of these findings are supported by substantial evidence. The two findings that are not supported (FOF 20 and 154) are discussed below.

that he would collect an additional attorney fee. *Id.* at 937. Thus, part of FOF 20 conflicts with FOF 181.

Despite these errors, the HO's legal conclusion that Feyissa violated RPC 1.4(b) is still supported by the findings of fact and by the record. In total, seven clients whose cases were impacted by *Mahler* fees testified. *Id.* at 938 (FOF 183). In unchallenged FOF 183, the HO found this testimony "sufficient to illustrate the ambiguities of the *Mahler* Surcharge Provision, the lack of any information at the time of the fee agreement's execution that the Mahler fees would range on the order of 8% - 20%, and the lack of any disclosure of the methodology of how Mahler fees were computed at the time of the final accountings." *Id.* Read as a whole, the clients' testimony supports this conclusion. The HO was free to give little weight to Feyissa's self-serving testimony that he sufficiently explained the *Mahler* provision at the time each client signed the fee agreement. *Id.* Further, since it is undisputed that Feyissa misunderstood the holding of *Mahler* as entitling him to the insurer's proportionate share, his explanation of the *Mahler* provision at the time these clients signed fee agreements would have conveyed that erroneous understanding. *Id.* Given the facial ambiguity of the provision combined with Feyissa's erroneous interpretation of the case and the lack of evidence that Feyissa disclosed how the fee was calculated or that it could increase his attorney fee by up to 20 percent, we affirm the HO's conclusion that Feyissa violated RPC 1.4(b).

C. Misrepresenting the amounts of subrogation liens against clients' recoveries

The second clause of count 3 charges Feyissa with violating RPC 1.4(a), RPC 1.4(b), RPC 1.5(c)(3), and/or RPC 8.4(c) by "misrepresenting the amounts of subrogation liens against one or more client's recoveries." Feyissa acknowledges that the HO "found that this portion of Count 3 was proven by Mr. Feyissa calculating the Mahler fee based on the full amount of the PIP lien even when the carrier agreed to reduce or waive its lien." Appellant's Opening Br. at 66 (citing CP at 954-56 (COL 230-234)). But he argues that that is not the same as "misrepresent[ing] the amount of any lien." *Id.*

We disagree. As the Bar explains, "the hearing officer made multiple findings that insurers had agreed to reduce or waive their liens, yet the final accountings Respondent provided to clients reflected only the original lien amount, not the actual lien amount in effect at the time of the final accountings." Answering Br. at 80. "To the extent those final accountings stated that an original lien amount was reduced, they made it appear as if the lien was reduced to the amount of *Mahler* fees collected by Respondent." *Id.* Substantial evidence supports the HO's conclusion that Feyissa misrepresented the amount of subrogation liens against one or more client's recoveries. CP at 956 (COL 237).

D. Misrepresenting to whom *Mahler* and/or other fees would be paid

The final clause of count 3 charged Feyissa with violating RPC 1.4(a), RPC 1.4(b), RPC 1.5(c)(3)[10] and/or RPC 8.4(c) by "making one or more misrepresentations as to whom the 'Mahler' and/or other fees would be paid."

RPC 8.4(c) bars a lawyer from engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation." Feyissa argues he did not violate RPC 8.4(c) because failing to identify the recipient of a fee "is not equivalent to a misrepresentation." Appellant's Opening Br. at 68. A "misrepresentation" is "[t]he act or an instance of making a materially false or misleading assertion about something, usu[ally] with the intent to deceive." BLACK'S LAW DICTIONARY 1195 (12th ed. 2024); *see also id.* at 1196, "passive misrepresentation" ("leading a person to believe something that isn't true without actually making any false statements"). Here, the HO made numerous well-supported findings that Feyissa's final accountings intentionally obscured the fact that he was the one receiving the *Mahler* fee and instead made it look like the *Mahler* fee was going to the insurers. *See* CP at 919-20 (FOF 112, 117), 923-25 (FOF 127, 131, 133), 928-29 (FOF 146, 149), 936

---

[10] RPC 1.5(c)(3) provides that "upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination."

(FOF 177), 957 (COL 241); Exs. 149, 268, 299, 341, 406;[11] *see also* CP at 943-44

(FOF 200) (unchallenged finding accepting testimony of Bar's accounting expert

that "Respondent's final accountings failed to disclose the amount of the 'Mahler

fees' taken by Respondent"). These findings support the HO's conclusion that each

of the 16 clients' final accountings was facially ambiguous as to who received the

*Mahler* fee.[12] They also support the conclusion that Feyissa's "failure to fully

disclose his deducting a *Mahler* Surcharge, with the attendant failure to disclose the

method by which the surcharge was calculated, combined with the drafting of the

Final Accounting to make it appear that the amounts were paid to the PIP insurer,"

constituted a misrepresentation that violated RPC 8.4(c), as well as a violation of

RPC 1.5(c)(3). CP at 957-58 (COL 243).

---

[11] Feyissa challenges the HO's findings that he "intentionally obscured" his receipt of *Mahler* fees for SR, AW, GT, HS, and AM in FOF 112, 117, 131, 133, and 177. CP at 919-20, 924-25, 936. But these findings are supported by substantial evidence. On their face, the original final accountings do not state the recipient of the *Mahler* fee; instead, the documents make it appear that the fee was paid to the insurer. Further, in AW's and GT's cases, the final accountings failed to state that the insurer had waived or reduced its PIP lien. The findings of fact explained all of this in detail. The HO's inference that Feyissa intentionally obscured his receipt of the *Mahler* fee is supported by substantial evidence. *Huynh*, 3 Wn.3d at 659 ("[A] lawyer's knowledge and intent may be inferred from the circumstances." (citing *Placide*, 190 Wn.2d at 441; RPC 1.0A(f))).

[12] Feyissa specifically challenges the portion of COL 241 that concluded that the original final accountings for clients GH and ME were ambiguous. Appellant's Opening Br. at 70; CP at 957. But the HO's description of the clients' original final accountings is accurate and supports the legal conclusion that those documents were facially ambiguous.

The HO also concluded that Feyissa violated RPC 1.5(c)(3) because his final accountings failed to state how he determined the amount of the *Mahler* fee. *Id.* Feyissa challenges this conclusion on the ground that count 3 did not specifically charge him with that conduct. Appellant's Opening Br. at 72.

This requires us to consider ELC 10.3(a)(3), which provides that the "formal complaint must state the respondent's acts or omissions in sufficient detail to inform the respondent of the nature of the allegations of misconduct." But "[t]here is no requirement that every fact, specific element, or pertinent legal theory be pleaded in the complaint to justify the reason for the charges." *Huynh*, 3 Wn.3d at 684 n.8. By charging Feyissa with violating RPC 1.5(c)(3) and referencing his misrepresentations of the *Mahler* fee, the complaint gave him sufficient notice of the nature of the allegations of misconduct.

In sum, despite some errors in factual findings, we conclude that the Bar proved count 3.

## Count 4

Count 4 provided, "By charging and/or collecting unreasonable fees, Respondent violated RPC 1.5(a)." RPC 1.5(a) provides that a lawyer "shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." The HO found that this count applied to three subsets of clients who

were charged *Mahler* fees: six clients whose fee agreements lacked the *Mahler* provision; two clients who were charged a *Mahler* fee on non-PIP lien amounts to which *Mahler* is inapplicable; and nine clients whose fee agreements contained the *Mahler* provision and whose cases involved PIP payments. CP at 959 (COL 247).

While Feyissa assigns error to all of the HO's conclusions of law for count 4, his primary argument is that the complaint failed to give him sufficient notice of the nature of the allegations as to each subset of clients. We reject this argument.

### A. The nine clients whose fee agreements contained *Mahler* provisions

Feyissa argues that count 4 must be dismissed as to the nine clients whose fee agreements contained the *Mahler* provision because the complaint did not allege violations of specific subsections of RPC 1.5(a). CP at 958 (COL 244); Appellant's Opening Br. at 80-81. The HO rejected this argument, concluding that the complaint's citation to RPC 1.5(a) sufficed to put Feyissa on notice that each subsection of the rule could be considered. CP at 958 (COL 244).

We agree. The complaint "alleged facts related to Respondent's collection of fees for each client and then specifically alleged each client's fee was unreasonable and charged a violation of RPC 1.5(a) in Count 4." Answering Br. at 85. And the text of RPC 1.5(a) makes clear that each subsection of the rule constitutes a factor to consider in determining whether a fee was reasonable. *See, e.g.*, *In re Disciplinary*

51

*Proc. Against Boelter*, 139 Wn.2d 81, 95-96, 985 P.2d 328 (1999) (looking to factors under RPC 1.5(a) to determine if lawyer violated the rule); *In re Disciplinary Proc. Against VanDerbeek*, 153 Wn.2d 64, 84-85, 101 P.3d 88 (2004) (same). Feyissa cites no authority suggesting that the Bar must cite specific subsections of RPC 1.5(a) to provide sufficient notice.

### B. The two clients charged *Mahler* fees on non-PIP liens

The HO found that Feyissa violated RPC 1.5(a) as to AA and BA because those clients were improperly charged *Mahler* fees on non-PIP liens (that is, liens to which the *Mahler* rule does not apply). CP at 960 (COL 249). Contrary to Feyissa's claim, the complaint clearly informed him of the nature of this alleged misconduct. *See* CP at 580-81 (paras. 183, 189, 190, 195) (alleging that Feyissa improperly collected additional, unreasonable fees on AA's Optum lien), 603 (paras. 474, 477, 479, 480, 481, 482) (alleging same as to BA's L&I lien). Further, Feyissa does not challenge the findings that charging these clients a *Mahler* fee was improper. CP at 917 (FOF 106-107).

### C. The six clients whose fee agreements lacked *Mahler* provisions

The HO concluded that Feyissa violated RPC 1.5(a) by charging a *Mahler* fee to six clients (AW, GT, SR, HS, AM, and GH) whose fee agreements completely lacked the *Mahler* provision. CP at 959-60 (COL 248). Feyissa does not dispute that

the Bar proved count 4 as to three of those clients. Appellant's Opening Br. at 73; Answering Br. at 82. But he argues that count 4 must be dismissed as to AW, GT, and SR because the complaint inaccurately stated the amounts of money Feyissa improperly took from these clients' settlements. Appellant's Opening Br. at 74. Feyissa argues that the complaint thus "did not disclose the nature of the alleged misconduct for these three clients." *Id.*

We disagree. Count 4 charged Feyissa with "collecting unreasonable fees." *Any* amount of *Mahler* fees taken from this subset of clients was unreasonable, because the clients' fee agreements contained no provision authorizing Feyissa to take an additional percentage of their settlement. Indeed, Feyissa implicitly acknowledges this by conceding that ODC proved count 4 as to HS, AM, and GH. The complaint was clear about the nature of the allegations: charging an unreasonable fee not authorized by the fee agreement. Feyissa does not show that these inaccuracies in the complaint deprived him of notice about the nature of the alleged misconduct.

### D. Challenges to factual findings regarding expert testimony

Feyissa argues that some of the HO's conclusions on the RPC 1.5(a) factors "were not supported by the evidence at hearing." *Id.* at 79. But the testimony of the Bar's expert, David Heller, provided substantial evidence to support these

conclusions, specifically the conclusion that Feyissa's cases did not involve unusual amounts of time and labor, that Feyissa's attorney fees in the range of 41-59 percent greatly exceeded the 33-40 percent range typical in Seattle for this type of work, and that the amounts involved and the results obtained were relatively standard. CP at 960-61 (COL 252); 5 VRP at 1318, 1426-27.

Philip Talmadge served as Feyissa's expert witness on fee issues. Feyissa challenges FOF 196, CP at 942-43, which found that Talmadge's testimony was "of limited potential applicability" because he "expressly did not review the enumerated factors of RPC l.5(a), and in particular declined to review RPC 1.5(a)(9)." This finding is erroneous: Talmadge did review RPC 1.5(a) factors and testified that he believed Feyissa's fee agreement with client BG satisfied RPC 1.5(a)(9). 8 VRP at 1869.[13]

Despite this error, we conclude that the HO did not err in deciding to give less weight to Talmadge's expert testimony. The HO reasonably chose to give significant weight to the testimony of the Bar's expert, Heller, because Heller reviewed the files for the 16 clients named in the complaint in reaching his opinion. 5 VRP at 1314-15. By contrast, Talmadge specifically testified that he was not offering an opinion

---

[13] Feyissa also challenges FOF 198 relating to Talmadge's testimony. CP at 943. That finding is supported by substantial evidence.

on whether Feyissa's fees were reasonable and that he had reviewed only one or two client files in forming his opinion. 8 VRP at 1856. Further, Talmadge's testimony was not necessary for the HO to analyze the RPC 1.5(a)(9) factor, which is identical to RPC 1.4(b) discussed in count 3—both RPCs require reasonable and fair disclosure of material terms of the fee agreement. The HO's conclusion that Feyissa failed to give a reasonable and fair disclosure of a material term of the fee agreement is supported for all the reasons described above regarding count 3.

Count 6

Count 6 reads:

By submitting false evidence to ODC during a grievance investigation, Respondent violated RPC 8.1(a), RPC 8.4(c), and/or RPC 8.4(*l*) (by violating ELC 1.5 and/or ELC 5.3).

CP at 604-05.

### A. Due process challenge

This count relates to the fact that Feyissa created false declarations and false revised fee agreements in October 2019 for clients AW, GT, and SR, then gave them to his attorney, who submitted them to ODC in response to a document request.

Critically, Feyissa concedes that these documents are false. *See* 12 VRP at 2663 (in closing, respondent's counsel stated, "so we agree obviously the declarations weren't true"); Disciplinary Proc. Hr'g (May 2, 2025) at 15 ("So that's

55

the false part. . . . [w]e're not contesting . . . the part about whether [the declarations were] true or false.").

But Feyissa argues that count 6 must be dismissed anyway because its language does not accurately reflect the misconduct claimed or the evidence presented at the hearing. Appellant's Opening Br. at 51 (citing *Poole*, 156 Wn.2d 196).

Again, we disagree. The complaint clearly alleges that the original fee agreements for AW, GT, and SR lacked the *Mahler* provision, that each of the three declarations Feyissa drafted for these clients to sign was "knowingly false," and that Feyissa "submitted" the false declarations during the grievance investigation. CP at 568-69 (paras. 39, 40, 43) (AW), 571 (paras. 72, 73, 76) (GT), 574 (paras. 113, 114, 117) (SR). The complaint thus provides "specific detail as to the respondent's acts or omissions regarding acts of dishonesty, deceit, and misrepresentation" as required by ELC 10.3(a)(3). *Placide*, 190 Wn.2d at 430. This sufficed to inform him of the nature of the charged misconduct and it matched the evidence presented at the hearing.

B. Challenge to conclusions of law

Feyissa also argues that the Bar did not prove count 6 because Feyissa, personally, did not submit the false documents to the Bar and because Feyissa's

attorney did not submit the documents "as evidence" but submitted them only because they were responsive to ODC's document request. Appellant's Opening Br. at 47-48.

We reject both these arguments. First, Feyissa argues that the false declarations and attachments were not "evidence." But unchallenged findings of fact, which are verities on appeal, found that Feyissa intentionally created this false evidence for use in the disciplinary proceeding. CP at 812 (FOF 100), 811 (FOF 98).

Second, even apart from the unchallenged findings of fact, the documents are "evidence." "Evidence" is "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact." BLACK'S LAW DICTIONARY, *supra*, at 696. The declarations and attachments contained assertions that, if believed, would tend to disprove allegations in the grievance that Feyissa stole from clients or charged unreasonable fees. The HO's conclusion that the documents are evidence is sound. CP at 859 (COL 255-256).

Feyissa continues that since he did not personally send the documents to the Bar, he did not "submit" them. He argues that he did not know his attorney would send the documents to the Bar and that he never asked her to do so.

We reject these arguments. The attorney's submission of false documents on Feyissa's behalf is properly attributable to Feyissa. The general rule is "if an attorney is authorized to appear on behalf of a client, that attorney's acts are binding on the client." *Barr v. MacGugan*, 119 Wn. App. 43, 46, 78 P.3d 660 (2003) (citing *Haller v. Wallis*, 89 Wn.2d 539, 547, 573 P.2d 1302 (1978)); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962) (party who chooses to have a lawyer generally cannot "avoid the consequences of the acts or omissions of this freely selected agent").

Feyissa has not shown why this general rule does not apply to him. Feyissa intentionally created those falsified documents as evidence for use in the disciplinary proceeding, as an unchallenged factual finding confirms. CP at 915 (FOF 100). The same month Feyissa created the false documents, he gave them to the attorney representing him in this matter. 7 VRP at 1615. His attorney submitted those falsified documents to ODC pursuant to her duty under the ELCs because they were responsive to ODC's document request. The HO made the permissible inference from these facts that Feyissa intentionally submitted the false evidence to ODC. *Huynh*, 3 Wn.3d at 659 ("[A] lawyer's knowledge and intent may be inferred from the circumstances." (citing *Placide*, 190 Wn.2d at 441; RPC 1.0A(f))).

Feyissa argues that the HO erred in denying his attorney's motion to testify at the hearing regarding the submission of the false documents. But the HO permitted

Feyissa's attorney to make an offer of proof as to her proposed testimony before ruling on its admissibility. 11 VRP at 2516-17. The offer of proof showed that the attorney would testify that Feyissa did not specifically direct her (the attorney) to submit the false declarations and that she submitted the documents to ODC only because they were responsive to ODC's document request. 10 VRP at 2476-84; 11 VRP at 2516. The HO found that this testimony was unnecessary because the HO viewed the issues of whether the documents were "evidence" and whether Feyissa "submitted" them to ODC as legal questions. 10 VRP at 2481; 11 VRP at 2517. We agree; the fact that Feyissa did not specifically direct the lawyer to provide documents responsive to the ODC request is irrelevant. Thus, the HO did not abuse her discretion in denying the attorney's motion to testify.

In sum, the complaint sufficiently informed Feyissa of the nature of the allegations against him and the findings of fact support the HO's conclusion that ODC proved count 6.

Count 8

Count 8 charged Feyissa with violating RPC 1.15A(f) by failing to promptly pay massage provider Fanning what she was owed. Because the presumptive sanction on this count was reprimand and not disbarment, we need not review Feyissa's challenges. *See Jackson*, 180 Wn.2d at 233 (citing *In re Disciplinary Proc.*

*Against Petersen*, 120 Wn.2d 833, 854, 846 P.2d 1330 (1993) (if facts sufficient to disbar on certain counts, court need not review other charged counts)). Nevertheless, the record clearly shows an eight-month gap between the date of the settlement and the date that Feyissa finally paid Fanning, after Feyissa made numerous attempts to coerce Fanning to reduce her bill.

IV.    Sanction analysis

We conclude that the Bar proved counts 2, 3, 4, 6, and 8 by a clear preponderance of evidence. Feyissa next challenges the HO's sanction analysis for each count and the Board's adoption of the recommended sanction of disbarment.

Once the HO concludes that ODC has proved a count of misconduct, she next considers the appropriate sanction. The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 ed. & Supp. 1992) govern lawyer sanctions in Washington. *Cohen*, 150 Wn.2d at 758. "This court evaluates whether the hearing officer properly determined the presumptive sanction by considering (1) the ethical duty or duties that the lawyer violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's misconduct." *Id.* "Next, we consider whether the hearing officer properly weighed the aggravating and mitigating factors." *Id.* Finally, this court "considers the recommended sanction in light of . . . the degree of unanimity among the Board and its proportionality with sanctions

imposed for similar misconduct." *Id.* (citing *In re Disciplinary Proc. Against Kuvara*, 149 Wn.2d 237, 259, 66 P.3d 1057 (2003)).

The HO found that the presumptive sanction for most of the counts was disbarment. But she based her ultimate recommendation of disbarment solely on count 6 and its related aggravating factors.

We have already concluded that the Bar proved count 6 by a clear preponderance of evidence. Thus, we consider only the challenge to the presumptive sanction analysis for count 6.

A. Duty violated and presumptive sanction analysis for count 6

The HO determined that A.B.A. *Standards* std. 6.1 applied to the RPC violations charged in count 6. CP at 967 (SA 276). She was correct. That standard provides:

> Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

A.B.A. STANDARDS std. 6.11.

The HO found that the record showed that Feyissa "intentionally provided ODC with false documents in response to ODC's investigation requests." CP at 967 (SA 276). The HO further found that Feyissa's conduct in submitting false evidence

harmed the public and the legal system, *id.* at 963-64 (COL 261), that it caused a "significant or potentially significant adverse effect" on the disciplinary proceeding, and that the "conduct was prejudicial to the administration of justice." CP at 915-16 (FOF 101). The HO additionally found that the conduct "caused ODC to unnecessarily expend time and resources in reliance upon the false declarations," CP at 963 (COL 258), since "[a]ll three earlier versions of the formal complaint assumed that given the alleged absence of the original fee agreements, Respondent had begun representation of AW, GT, and SR, without a written fee agreement." *Id.* (COL 257). The HO concluded that the presumptive sanction for this count is disbarment. CP at 967 (SA 276), 963-64 (COL 261).

Feyissa argues that the evidence does not support the finding that he had a mental state of intent, making essentially the same argument that he did when arguing that he did not "submit" the false declarations. He argues that he did not know that his attorney was going to submit the declarations to ODC and that he did not direct her to do so. For the reasons discussed above, we reject this argument.

Feyissa also argues that the HO's determination that ODC relied on the false declarations lacks support. Appellant's Opening Br. at 53 (citing CP at 908 (FOF 75), 915-16 (FOF 101)). To be sure, the HO's finding on this issue is somewhat confusing: the false declarations all stated (accurately) that there had been an original fee agreement but that the client had lost it. And ODC's first three formal complaints

62

alleged that there had been *no* original fee agreements in those cases, suggesting that ODC did not rely on those declarations' assertions that the fee agreements in those cases were lost.

But ODC did expend resources pursuing its theory that Feyissa improperly charged *Mahler* fees in those cases due to lack of a fee agreement transferring ownership of those fees to him. When ODC finally learned that Feyissa actually had fee agreements in those cases, but that those fee agreements were later falsified, ODC had to expend further resources investigating whether the *Mahler* fees were improper for other reasons. So the HO's findings that ODC relied on the false declarations are well supported by the evidence.

And even if the findings that ODC relied on the false declarations were erroneous, the HO's determination that disbarment was the presumptive sanction for this count was still correct. We have "stated unequivocally that '[f]alsifying information during an attorney discipline proceeding' itself harms the public and the legal system." *In re Disciplinary Proc. Against Simmerly*, 174 Wn.2d 963, 990, 285 P.3d 838 (2012) (alteration in original) (citing *Whitt*, 149 Wn.2d at 720). Here, the HO specifically concluded that Feyissa falsified information during an attorney disciplinary proceeding, that this conduct harmed the public and the legal system, and that it was prejudicial to the administration of justice. CP at 963-64 (COL 261), 915-16 (FOF 101). At a minimum, Feyissa's conduct caused "a potentially

significant adverse effect on the legal proceeding." A.B.A. STANDARDS std. 6.11. This supports disbarment.

B. Aggravating and mitigating factors

The HO found seven aggravating factors: dishonest or selfish motive (A.B.A. *Standards* std. 9.22(b)); pattern of misconduct (A.B.A. *Standards* std. 9.22(c)); multiple offenses (A.B.A. *Standards* std. 9.22(d)); bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency (A.B.A. *Standards* std. 9.22(e)); submission of false evidence, false statements, or other deceptive practices during the disciplinary process (A.B.A. *Standards* std. 9.22(f)); refusal to acknowledge wrongful nature of conduct (A.B.A. *Standard* std. 9.22(g)); and substantial experience in the practice of law (A.B.A. *Standards* std. 9.22(i)). She found three mitigating factors: absence of prior disciplinary record (A.B.A. *Standards* std. 9.32(a)); timely good faith effort to make restitution or to rectify consequences of misconduct (A.B.A. *Standards* std. 9.32(d)); and character or reputation (A.B.A. *Standards* std. 9.32(g)).

Feyissa argues that the HO erred in analyzing these factors. We discuss only the aggravating and mitigating factors relevant to the HO's disbarment recommendation in this case. As stated, she based that recommendation on both the misconduct alleged in count 6 and Feyissa's "numerous acts of deceptive testimony

64

about his client files, and his bad faith obstruction of discovery during the disciplinary process." CP at 974 (SA 300). We conclude that the HO properly analyzed mitigating and aggravating factors.

Mitigating factors

Feyissa argues that the HO erred in declining to apply several additional mitigating factors and by undervaluing the evidence related to Feyissa's character and reputation. Most of the additional mitigating factors discussed by Feyissa are not relevant to count 6, so we do not discuss them here.[14]

### i. *Character and reputation (A.B.A.* Standards *std. 9.32(g))*

The HO found that this mitigating factor applied "due to [Feyissa]'s significant pro bono activities on behalf of the Ethiopian community." CP at 972 (SA 292). Feyissa argues that the HO undervalued "noteworthy volunteer work he did outside the Ethiopian community" and positive character testimony from other witnesses. Appellant's Opening Br. at 96-97. But, as detailed in FOF 12, most of the evidence about Feyissa's pro bono activities related to work he did on behalf of the Ethiopian community. CP at 891-92. It is therefore reasonable that the HO credited that work as the most significant.

---

[14] Specifically, Feyissa's arguments about the mitigating factors of lack of selfish or dishonest motive, remorse, cultural differences, and lack of training do not relate to count 6.

### ii. *Personal or emotional problems (A.B.A. Standards std. 9.32(c))*

Feyissa argues that the HO erred in declining to apply the mitigating factor of personal or emotional problems. The lawyer bears the burden of establishing a mitigating factor. *In re Disciplinary Proc. Against Carpenter*, 160 Wn.2d 16, 30, 155 P.3d 937 (2007). Critically, for this mitigating factor to apply, the lawyer must show a connection between their asserted personal or emotional problems and the misconduct. *In re Disciplinary Proc. Against Holcomb*, 162 Wn.2d 563, 591, 173 P.3d 898 (2007).

Here, Feyissa presented evidence that he suffered from depression from 2012 to 2022, a period where he was fighting for custody of his daughter and was deeply concerned that her mother was mistreating her. Numerous friends and family testified that during this time Feyissa expressed suicidal thoughts, experienced sleep disturbances, and became withdrawn and uncharacteristically unsociable and irritable. Two doctors testified that they concluded Feyissa suffered from clinical depression during this time. CP at 944 (FOF 201). Feyissa eventually won full custody of his daughter in 2022, and his mental state improved.

The HO accepted all of this testimony. She found that "Respondent's concerns for his child's well-being were genuine—as confirmed by friends who testified on his behalf." *Id.* (FOF 202).

But the HO still found that the mitigating factor of personal or emotional problems did not apply because Feyissa did not show the required "connection between the asserted emotional problem and the misconduct." *Id.* at 971 (SA 288). Specifically, the HO found that the evidence did not connect Feyissa's depression with his misreading of the *Mahler* decision, his "intentional failure" to cooperate in producing documents during the investigation, or "his creation of the false declarations of AW, GT, and SR." *Id*. She specifically noted that expert Dr. Tutty's testimony failed to link Feyissa's depression to his billing practices, his misrepresentations to third-party insurers and medical providers, or to "any other errors committed by Respondent in his legal practice." CP at 944-45 (FOF 203).

Moreover, this court has never held that personal or emotional problems mitigate misconduct that involves intentional, affirmative acts of dishonesty like making false statements, forgery, or theft. In *In re Disciplinary Proceeding Against Waechter*, the attorney was charged with 15 counts of misconduct, which included conversion of client funds, forgery, and trust account violations. 191 Wn.2d 20, 419 P.3d 827 (2018). An expert psychologist testified that Waechter "likely suffered" compassion fatigue, which "caused Waechter to be careless and avoid stresses, such as his bookkeeping duties." *Id.* at 32. We held that the Board erred by failing to consider the emotional or personal problems mitigator because the testimony provided a connection between Waechter's emotional problems and poor

bookkeeping, which related to the charges of trust account violations. *Id.* at 33. But we also held that the evidence did not provide a connection between Waechter's emotional problems and the most serious counts of converting client funds and forging a client's signature. *Id.* Thus, under the totality of the circumstances, we concluded that the error was harmless.

Likewise, in *In re Disciplinary Proceeding Against Christopher*, we rejected the Board's adoption of the personal or emotional problem mitigator because "[t]here is no demonstrated connection between [the attorney's] problems and the intentional and deliberate falsification of documents" that the attorney submitted to a court. 153 Wn.2d 669, 684, 105 P.3d 976 (2005); *see also Petersen*, 120 Wn.2d at 868 (1993) (attorney's depression was not a significant mitigating factor where attorney converted client funds); *In re Disciplinary Proc. Against Hicks*, 166 Wn.2d 774, 789, 214 P.3d 897 (2009) (no connection between attorney's personal and emotional problems and misconduct relating to making false statements to ODC during investigation).

Feyissa's case is similar. His depression might have contributed to his misreading of *Mahler*, to the ambiguous wording of the *Mahler* provision, to his failure to sufficiently explain the meaning of the provision to clients, or to the way he communicated with others (like Fanning). And proper consideration of his depression on the counts related to that conduct might possibly have changed the

recommended sanction on those counts. But Feyissa does not explain how his depression connects to his intentional decisions to create false declarations and false fee agreements and give them to his attorney in the grievance investigation. The HO did not err in concluding that this mitigating factor did not alter the presumptive sanction of disbarment for count 6.[15]

### iii. Delay (A.B.A. Standards std. 9.32(j))

Feyissa argues that the HO erred in declining to apply the mitigating factor of delay based on the four-year span between the first grievance and the hearing date. Appellant's Opening Br. at 98. He also argues that ODC committed unjustified prosecutorial delay. *Id.* at 99.

This delay factor applies when an attorney shows "that the proceeding's time span resulted in unfair prejudice to him or her, or is caused by unjustified prosecutorial delay." *Preszler*, 169 Wn.2d at 33. The attorney's burden of

---

[15] Feyissa assigns error to FOF 202, which found that while Feyissa "placed great blame for his depression, on his child custody disputes . . . it is worth noting the record submitted by Respondent during the hearing, indicates that the limitations on his visitation rights in large part were due to his decade-long refusal to complete" court-ordered domestic-violence-related programs. CP at 944. Feyissa argues that no evidence was presented at the hearing to support the conclusion that he refused to complete those programs or that any refusal affected his visitation. Appellant's Opening Br. at 90-91. But FOF 202 cited a court order that Feyissa himself submitted as an exhibit; the hearing officer is permitted to consider the contents of exhibits. Feyissa did not designate that exhibit for review on appeal, so we cannot assess its contents. Even if the hearing officer's finding on this issue was wrong, the finding has no impact on the hearing officer's conclusion that Feyissa failed to connect his depression to count 6. CP at 944.

establishing this factor "is more difficult to meet when the attorney plays a role in extending the length of time in the proceeding." *Id*. (citing *Cohen*, 149 Wn.2d at 341).

Here, Feyissa played a major role in extending the duration of the proceeding through his delays in complying with ODC document requests. Feyissa did not fully comply with the chief hearing officer's December 5, 2020, order to comply with ODC's first document request until July 14, 2023, when he finally produced key documents related to AW, GT, SR, HS, and AM. CP at 911-12 (FOF 88). These included documents that Feyissa knew were in his possession as early as October 2019 and that were directly responsive to that first document request. *Id.* And it was Feyissa's belated production of the GT and AW electronic fee agreements, among other documents, that led ODC to discover the October 2019 declarations were false. ODC amended the complaint to add count 6 after making that discovery. We reject Feyissa's characterization of ODC as creating unjustified delay because his conduct was a significant factor in any delays. Further, it appears that some of the delay was caused by COVID-19, a factor outside of either party's control.

Aggravating factors

Feyissa challenges the HO's application of several aggravating factors. Appellant's Opening Br. at 105. We discuss the two aggravating factors that are relevant to the HO's disbarment recommendation.

> i. *Bad faith obstruction of disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency (A.B.A.* Standards *std. 9.22(e))*

The HO concluded that this aggravating factor applied because of Feyissa's "multiple willful and intentional acts over the course of several years, attempting to evade production of documents." CP at 969 (SA 282).

Feyissa first argues that ODC did not allege this aggravating factor, but aggravating factors "may be considered without being formally charged in the complaint." Appellant's Opening Br. at 106; *Burtch*, 162 Wn.2d at 889.

Feyissa also challenges the application of this aggravator because he characterizes it as unfairly punishing him for using the procedures available to him in the ELCs. Appellant's Opening Br. at 106-07 (citing *Marshall*, 167 Wn.2d at 84). But the HO's application of this aggravating factor is not based on the permissible use of ELC procedures. Instead, it is largely based on Feyissa's repeated failure to produce the original electronic fee agreements of GT and AW, which he knew he had since October 2019. CP at 914 (FOF 96). Despite knowing he possessed these

71

documents, Feyissa through counsel repeatedly falsely stated that he could not find these clients' files. Exs. R558, R560. Even after the chief hearing officer ordered him to produce the requested files in December 2020, Feyissa continued to state that he did not have them. Ex. 6. Unchallenged findings of fact establish that Feyissa intentionally failed to comply with the December 2020 discovery order and that this amounted to bad faith obstruction of the disciplinary proceeding. CP at 914-15 (FOF 99), 915 (FOF 102-104), 969 (SA 282) (concluding failure to comply with this order "was particularly disrespectful to the disciplinary process"). Further, unchallenged FOF 188 found that Feyissa "willfully and intentionally failed to cooperate with ODC's investigation prior to the filing of the Formal Complaint" and that he "willfully and intentionally failed to comply with the Chief Hearing Officer's order of December 5, 2020." CP at 939-40. We uphold the HO's application of this aggravating factor. *Id.*

> ii. *Submission of false evidence, false statements, or other deceptive practices during the disciplinary process (A.B.A.* Standards *std. 9.22(f))*

The HO applied this factor based on both the misconduct charged in count 6 and "the lengthy procedural history over the course of the investigation phase and during the disciplinary proceeding." CP at 969 (SA 283).

Count 6 charged Feyissa with submitting false evidence. Thus, application of the "submission of false evidence" part of this aggravating factor to that count would improperly double-count the same misconduct as both a charge and an aggravating factor. The Bar agrees. Answering Br. at 111.

But unchallenged findings and evidence in the record support the HO's application of the "false statements or other deceptive practices during the disciplinary process" parts of this factor. As mentioned, during the investigation Feyissa through counsel made numerous false statements to the Bar that Feyissa could not find the client files for AW or GT. Exs. R558, R560. Feyissa was copied on all these letters, and there is no evidence that he ever attempted to correct any of the false statements. Feyissa also falsely stated in his May 2023 declaration that he did not have physical client files for five clients named in the formal complaint, including AW and GT. Ex. 17. But Feyissa did have those files and he ultimately produced them in response to ODC's requests for production in July 2023. CP at 910-12 (FOF 86-88).

Further, the HO found that Feyissa's hearing testimony about when he moved files from his office to his home was contradictory and not credible. CP at 938-39 (FOF 185-187). She found that the contradictory testimony was "an intentional, bad faith attempt by Respondent to pre-date his moving his files to prior to ODC's February 13, 2020 Additional Request for Response to Grievance, in an attempt to

appear less culpable for not producing the files of AW, GT, SR, HS and AM in response to the Chief Hearing Officer's order of December 5, 2020." *Id.* at 939 (FOF 186). The HO's credibility findings are entitled to great weight.

Thus, the record supports this aggravating factor because Feyissa made false statements and engaged in deceptive practices throughout the investigation distinct from the submission of false evidence charged in count 6.

We uphold the HO's analysis of aggravating and mitigating factors. Feyissa has not shown that any additional mitigating factors should apply or that the HO applied the aggravating factors incorrectly.

### C. Proportionality and unanimity

"'We review the proportionality of sanctions only if the issue is raised by the attorney who is being disciplined.'" *Holcomb*, 162 Wn.2d at 592 (quoting *In re Disciplinary Proc. of Whitney*, 155 Wn.2d 451, 469, 120 P.3d 550 (2005)). "'The attorney facing discipline bears the burden of bringing cases to the court's attention that demonstrate the disproportionality of the sanction imposed.'" *Huynh*, 3 Wn.3d at 687 (internal quotation marks omitted) (quoting *In re Disciplinary Proc. Against Cramer*, 168 Wn.2d 220, 240, 225 P.3d 881 (2010)).

Although Feyissa mainly argues that count 6 was not proved, he also implicitly argues that the sanction for count 6 is disproportionate because his conduct

differed from the conduct in three cases that supported disbarment based on submission of false evidence. Appellant's Opening Br. at 53.[16]

We disagree.

In *Whitt*, the attorney falsely told ODC she had not dismissed a client's case without the client's consent and she submitted false documents to ODC attempting to support the lie. 149 Wn.2d 707. In *Simmerly*, the attorney sent ODC a letter containing false information about client trust accounts and fabricated ledgers during a grievance investigation. 174 Wn.2d at 982. In *Van Camp*, the attorney sent ODC a false and exaggerated time reconstruction to support his argument that he had earned a $25,000 fee. 171 Wn.2d at 787.

Feyissa argues that there is "no similarity" between his conduct and the conduct justifying disbarment in those cases. Appellant's Opening Br. at 53. The distinction, he argues, is that those attorneys "manufactured documents and presented them to ODC as genuine to support a false claim that the lawyer had not engaged in misconduct." *Id.*

---

[16] Feyissa also made disproportionality arguments related to counts 2 and 4. Appellant's Opening Br. at 57, 84. Although the HO found the presumptive sanction for those counts was disbarment, her recommendation of disbarment was based solely on count 6 and related aggravating factors. CP at 974 (SA 299-300). Therefore, it is unnecessary to address the disproportionality arguments related to counts 2 and 4.

But Feyissa's conduct was no different. Just as in those cases, Feyissa created false evidence to try to hide or justify misconduct. And just as in those cases, Feyissa caused the evidence to be submitted to ODC during a disciplinary proceeding. The only distinction is that Feyissa was represented by counsel, so his false evidence was submitted through his attorney. As discussed above, Feyissa's attorney's submission of the documents is properly attributable to Feyissa. Feyissa fails to show that disbarment is a disproportionate sanction for submitting false evidence in a disciplinary proceeding—which, again, is "one of the most egregious charges that can be leveled against an attorney." *Whitt*, 149 Wn.2d at 720.

"A unanimous board decision will be upheld in the absence of a clear reason for departure." *Id*. at 717 (citing *Kuvara*, 149 Wn.2d at 258-59). We conclude that ODC proved all challenged counts by a clear preponderance of evidence, that the HO did not err in the sanction analysis, and that disbarment is not a disproportionate sanction for the serious misconduct of count 6. We therefore accept the Board's unanimous recommendation and order Feyissa disbarred.

V.     The Board chair did not abuse her discretion in denying respondent's challenge to ODC's cost bill

We review cost awards for abuse of discretion. *VanDerbeek*, 153 Wn.2d at 99 (citing *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 519, 910 P.2d 462 (1996)).

Abuse of discretion occurs "'only when no reasonable person would take the view adopted.'" *Whitney*, 155 Wn.2d at 465 (quoting *Bonet*, 144 Wn.2d at 510).

Under ELC 13.9(a), the Bar's costs and expenses "may be assessed" against a sanctioned attorney. Costs include "all monetary obligations, except attorney fees, reasonably and necessarily incurred" in the Bar's performance of its duties. ELC 13.9(b).

Here, the Bar sought an assessment of $33,984.88 for court reporter charges. DP at 216-17 (BF 222). Feyissa filed an exception to the cost statement, arguing in part that the charges were unreasonable because the court reporter firm the Bar hired charged above-market rates. Resp't's Exception to Am. Cost Statement (BF 224). In reply, the Bar argued that the firm did not charge above-market rates. Feyissa's attorney filed a declaration in response to the Bar's reply, making additional arguments about why the Bar's interpretation of the firm's invoices was wrong. Decl. of Anne Seidel (July 28, 2025) (BF 227). (There is no provision in the ELCs for such a reply declaration, but the Board chair considered it anyway.)

After considering all this information, the chair assessed $33,984.88 in court reporter charges against Feyissa. *In re Feyissa*, Pub. File No. 20#00053 (Bd. Chair Ord. Aug. 1, 2025) (BF 229). In the order, the chair noted that Feyissa had not

submitted a declaration from a certified court reporter stating that the rates were unreasonable. *Id.*

Feyissa argues that this ruling was an abuse of discretion because no such declaration is required. Appellant's Opening Br. at 111. He is correct that no such declaration is required. But we do not read the chair's order as stating any such requirement. Instead, the chair considered all the evidence submitted by the parties, determined that the court reporter costs incurred by the Bar were reasonable and necessary, and exercised her discretion to award those costs. That was not an abuse of discretion.

CONCLUSION

The record does not support Feyissa's claim that he is entitled to a new hearing on the ground of racial bias or any other kind of bias. The majority of the findings of fact are supported by substantial evidence, and those findings support the conclusions of law and the recommended sanction of disbarment. Any errors in the findings of fact are harmless. The HO's sanction analysis was also sound.

We therefore accept the Board's unanimous recommendation and order Feyissa disbarred.

Gordon McCloud, J.

WE CONCUR:

Stephens, C.J.

Whitener, J.

Johnson, J.

Mungia, J.

González, J.

Melody, J.

Montoya-Lewis, J.

Madsen, J. PT.

O cf ugp."LIROV0